# EXHIBIT 1

IN THE DISTRICT COURT IN AND FOR CARTER COUNTY
STATE OF OKLAHOMA

| | |
|---|---|
| **VALERO REFINING COMPANY-OKLAHOMA, a Michigan corporation,** | Case No: _CJ-19-148_ |
| **Plaintiff,** | Judge: _____ |
| v. | |
| **3M COMPANY, a Delaware corporation; E.I. DUPONT DE NEMOURS AND COMPANY, a Delaware corporation; THE CHEMOURS COMPANY, a Delaware corporation; NATIONAL FOAM, INC., a Delaware corporation; BUCKEYE FIRE EQUIPMENT COMPANY, an Ohio corporation; KIDDE-FENWAL, INC., a Delaware corporation; and DOE DEFENDANTS 1 TO 20,** | |
| **Defendants.** | |

FILED
IN DISTRICT COURT

JUN 2 8 2019

RENEE BRYANT, Court Clerk
Carter County, Oklahoma

### PLAINTIFF'S PETITION

Plaintiff Valero Refining Company-Oklahoma ("Valero" or "Plaintiff") for its Petition against the above named defendants (collectively, the "Defendants") alleges and states as follows:

### I.
### THE PARTIES

1.      Plaintiff Valero Refining Company-Oklahoma is a Michigan corporation with its principal place of business in San Antonio, Texas. It owns and operates the Ardmore Refinery in Carter County, Oklahoma.

2.      Defendant 3M Company ("3M") is a Delaware corporation, with its principal place of business in St. Paul, Minnesota. 3M designed, manufactured, marketed, and/or sold aqueous film-forming foam ("AFFF") products containing Long-Chain PFAS, and was in the business of designing, manufacturing, and/or selling AFFF products containing Long-Chain PFAS, that were

purchased and/or used by Valero or were stored and/or used on properties owned and/or operated by Valero.

3.    3M does business throughout the United States, including conducting business in Oklahoma, and is registered to do business as a foreign for-profit corporation in Oklahoma with the Secretary of State.

4.    Defendant E.I. du Pont de Nemours and Company ("EID") is a Delaware corporation with its principal place of business in Wilmington, Delaware.  EID designed, manufactured, marketed, and/or sold fluorosurfactants containing Long-Chain PFAS that were incorporated into AFFF products, and was in the business of designing, manufacturing, marketing, and/or selling fluorosurfactants with Long-Chain PFAS that were incorporated into AFFF products, and that were purchased and/or used by Valero or were stored and/or used on properties owned and/or operated by Valero.

5.    EID does business throughout the United States, including conducting business in Oklahoma, and is registered to do business as a foreign for-profit corporation in Oklahoma with the Secretary of State.

6.    Defendant The Chemours Company ("Chemours") is a Delaware corporation, with its main place of business located in Wilmington, Delaware.  In 2015, EID spun off its performance chemicals business to Chemours, and Chemours assumed a significant portion of EID's environmental liabilities – including those relating to Long-Chain PFAS – so that Chemours stands in the shoes of a Manufacturer Defendant (as defined below) for the claims made in this action.

7.    Chemours does business throughout the United States, including conducting business in Oklahoma, and is registered to do business as a foreign for-profit corporation in Oklahoma with the Secretary of State.

-2-

8.     Defendant National Foam, Inc. ("National Foam") is a Delaware corporation with its principal place of business in Angier, North Carolina. National Foam designed, manufactured, marketed, and/or sold AFFF products to Valero. National Foam designed, manufactured, marketed, and/or sold AFFF products containing Long-Chain PFAS, and was in the business of designing, manufacturing, marketing, and/or selling AFFF products containing Long-Chain PFAS, that were purchased and/or used by Valero or were stored and/or used on properties owned and/or operated by Valero.

9.     National Foam does business throughout the United States, including conducting business in Oklahoma.

10.     Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business in Kings Mountain, North Carolina. Buckeye designed, manufactured, marketed, and/or sold AFFF products containing Long-Chain PFAS, and was in the business of designing, manufacturing, marketing, and/or selling AFFF products containing Long-Chain PFAS, that were purchased and/or used by Valero or were stored and/or used on properties owned and/or operated by Valero.

11.     Buckeye does business throughout the United States, including conducting business in Oklahoma.

12.     Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a Delaware corporation with its principal place of business in Farmington, Connecticut. Kidde-Fenwal designed, manufactured, marketed, and/or sold AFFF products containing Long-Chain PFAS, and was in the business of designing, manufacturing, marketing, and/or selling AFFF products with Long-Chain PFAS, that were purchased, stored and/or used by Valero or were stored and/or used on properties owned and/or operated by Valero.

-3-

13.     Kidde-Fenwal does business throughout the United States, including conducting business in Oklahoma.

14.     3M, EID, Chemours, National Foam, Buckeye, and Kidde-Fenwal are collectively referred to herein as Manufacturer Defendants.

15.     DOE Defendants 1 to 20 are other designers, manufacturers, marketers, distributors, and/or sellers of AFFF products containing Long-Chain PFAS, suppliers of fluorosurfactants containing Long Chain PFAS that were incorporated into AFFF products, and who were in the business of designing, manufacturing, marketing, and/or selling AFFF products containing Long-Chain PFAS and supplying fluorosurfactants, which were sold to, stored, and/or used by Valero and/or were stored and/or used on properties owned and/or operated by Valero. When the DOE Defendants are identified, they will be added by name.

## II.
## VENUE AND JURISDICTION

16.     Venue is proper in Carter County, Oklahoma, pursuant to 12 O.S. §§ 131, 132 because this is an action seeking recovery for damages to real property and improvements thereon that is located in Carter County and Murray County, Oklahoma.  Moreover, Carter County is a county in which all or a substantial part of the events or omissions giving rise to the claims occurred, including the purchase of some of the products at issue.

17.     This court has jurisdiction over this case because no other court has exclusive jurisdiction.

18.     This court has personal jurisdiction over Defendants because they have sufficient contacts with the State of Oklahoma, both in general and with regard to these specific incidents, and exercising jurisdiction over them does not offend the traditional notions of fair play and substantial justice, so that exercising personal jurisdiction does not violate due process.

-4-

## III.
## BACKGROUND FACTS

19.      Per- and polyfluoroalkyl substances ("PFAS") are a family of synthetic compounds containing bonded fluorine and carbon.

20.      A subset of PFAS compounds, often referred to as "Long-Chain PFAS" because of their structurally longer chain of bonded fluorine and carbon atoms, include or break down into perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS"). Because of their waterproof, stain-resistant, non-stick properties, these Long-Chain PFAS have been used in numerous consumer products such as carpets, clothing, furniture fabrics, food packaging, cookware, and fire-fighting foams. Manufacturer Defendants designed, manufactured, marketed, distributed and/or sold Long-Chain PFAS utilized in these types of products and were in the business of designing, manufacturing, marketing, and/or selling products that utilized Long-Chain PFAS.

21.      Manufacturer Defendants designed, manufactured, marketed, and/or sold AFFF products containing Long-Chain PFAS, and/or supplied fluorosurfactants containing Long-Chain PFAS incorporated into AFFF products and were in the business of designing, manufacturing, marketing, distributing and/or selling AFFF products containing Long-Chain PFAS and supplying fluorosurfactants containing Long-Chain PFAS incorporated into AFFF products. Manufacturer Defendants' Long-Chain PFAS products are collectively referred to herein as "Manufacturer Defendants' AFFF products."

22.      AFFF was developed to extinguish fires involving flammable substances that cannot be extinguished with water alone. AFFF is used as a foam solution intended to be sprayed directly onto fires and onto spilled fuel, in order to prevent fires. The foam solution is sprayed on

the fire or fuel to provide a coat that blocks the supply of oxygen, generates a cooling effect, and creates an evaporation barrier. After the foam dissipates, a film forms to suffocate a fire.

23.     Having effective fire foam is vitally important to Valero and others in the petroleum industry.

24.     Refineries, bulk storage facilities, and terminals, such as those owned and operated by Valero, maintain and use AFFF to extinguish petroleum fires. These companies and facilities are the intended consumers of AFFF products.

25.     Valero owns and operates the Ardmore Refinery and associated facilities in Carter County, Oklahoma, where Manufacturer Defendants' AFFF products were purchased, stored, and/or used (the "Sites").

26.     Oklahoma refineries are critical to the nation's petroleum refining and chemical products production. The Oklahoma Energy Resources Board calls the oil and natural gas industry the economic engine of the state. According to the United States Energy Information Administration, Oklahoma was the nation's sixth-largest crude oil producing state in 2017. As of January 2018, Oklahoma had five operable petroleum refineries amounting to almost 3% of the total refinery processing capacity of the United States.

27.     At all relevant times, Manufacturer Defendants together controlled substantially all of the market in Oklahoma for AFFF products. These companies designed, manufactured, marketed, and/or sold AFFF products, and/or supplied fluorosurfactants incorporated into AFFF products, both individually and collectively through a variety of industry coalitions, trade associations, and groups in order to purposefully target Oklahoma as a market for AFFF products and to profit from that market.

28.     The United States Environmental Protection Agency ("USEPA") and state environmental agencies around the country are now aggressively investigating PFOA, PFOS, and other Long-Chain PFAS compounds and are in the process of establishing regulatory guidelines, Maximum Contaminant Levels ("MCLs"), and other cleanup standards for Long-Chain PFAS compounds.  USEPA is now moving forward with various regulatory actions, including listing PFOA and PFOS as hazardous substances under Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), creating MCL levels for drinking water, and/or creating remediation levels for PFOA, PFOS, and other Long Chain PFAS compounds.

29.     USEPA also recently released a 72-page Action Plan, which "outlines concrete steps the agency is taking to address PFAS."  The Action Plan describes near-term action taking place over the next two years, including moving forward with the MCL process outlined in the Safe Drinking Water Act for PFOA and PFOS, beginning the process of listing PFOA and PFOS in CERCLA, continuing enforcement actions and clarifying cleanup strategies, and expanding monitoring of PFAS in the environment, among other agency action.

30.     USEPA also recently sought public comment on a draft set of recommendations for cleaning up groundwater containing PFOA and PFOS to serve as a starting point for making site-specific cleanup decisions.  That guidance provides recommendations on screening levels for investigation and preliminary remediation goals as initial targets for cleanup levels.

31.     The State of Oklahoma supports the "evaluation of which PFOA/PFOS compounds may need to be phased out of common usage" under the Toxic Substances Control Act.  The State of Oklahoma also "support[s] consideration of making specific PFOA/PFOS compounds Superfund hazardous substances in order for EPA and/or states to use Superfund authority to address contaminated groundwater and surface water."

-7-

32.     As a result of these and other regulatory actions, Valero has incurred and will continue to incur costs of addressing Long-Chain PFAS related to Manufacturer Defendants' AFFF products.

33.     Manufacturer Defendants understood the true nature and properties of Long-Chain PFAS compounds for several decades before regulators, but actively concealed and misrepresented the nature of Long-Chain PFAS compounds to maximize their own profits. Further, Manufacturer Defendants were aware of alternative product designs, though they have only relatively recently shifted their production of fire-fighting foams and related fluorosurfactants away from use of Long-Chain PFAS to shorter chain PFAS (with six carbon molecular structures or fewer).

34.     Manufacturer Defendants withheld short-chain PFAS development, and did not offer AFFF with short-chain PFAS as an alternative product for decades.

35.     Recently, state environmental agencies around the country have disclosed that Manufacturer Defendants have long possessed information regarding risks and potential impacts of Long-Chain PFAS and their products, yet withheld that information from their customers, regulators, and the public, made fraudulent representations regarding PFOA, PFOS, and/or their products, and sold their products knowing them to be unfit for their intended purpose.

36.     As a direct and proximate result of the conduct and products of the Manufacturer Defendants, Valero has incurred and will continue to incur substantial damages and costs associated with their products at the Sites, including but not limited to disposing of and replacing unused products containing Long-Chain PFAS, detecting, investigating, and remediating to various regulatory standards related to Manufacturer Defendants' AFFF products and their Long-Chain PFAS constituents.   Manufacturer Defendants never revealed the contamination risks associated with their products and, merely because Valero and others purchased or used

-8-

Manufacturer Defendants' AFFF products exactly as intended and instructed at the Sites, Valero is now exposed to costs and damages to which it would not have otherwise been exposed. Valero did not know, and could not have known, the risks it was facing – of costs and damages they could incur – as a result of Manufacturer Defendants' AFFF products, and their concealment and fraudulent practices.

37.    As a result of Defendants' actions, Valero has suffered and will continue to suffer irreparable damage and harm. Valero has no adequate remedy absent an injunction.

38.    There is more than a reasonable probability that the injury sought to be prevented will be done if no injunction is issued.

39.    Accordingly, Valero brings this action for (1) compensatory damages consisting of general and site-specific costs and damages incurred and to be incurred by Valero including, but not limited to, costs to dispose of unused AFFF products; replacement costs; costs of identifying, investigating, monitoring, and/or remediating Manufacturer Defendants' AFFF products and related costs; and real property environmental stigma/loss of market value damages, (2) punitive damages, (3) injunctive relief, requiring Defendants to perform investigative efforts, remedial and other work caused or necessitated by Manufacturer Defendants' AFFF products, and (4) such other equitable relief as may be appropriate at law or equity under the facts established and proven by Plaintiff.

## IV.
## FRAUDULENT TRANSFER FACTS

40.    EID has substantial liabilities related to Long-Chain PFAS, which arise from its use and release of these chemicals at several of its plants around the country, as well as its manufacture and/or sale of products that contain Long-Chain PFAS. However, EID has sought to insulate itself from billions of dollars in these liabilities.

-9-

41.     For decades, EID used and/or manufactured Long-Chain PFAS at chemical plants in West Virginia, New Jersey and North Carolina. EID was sued multiple times by landowners and neighbors of those plants for liabilities arising out of Long-Chain PFAS. EID expended hundreds of millions of dollars litigating and settling those lawsuits. EID thus knew, or reasonably should have known, that it faced billions of dollars in liabilities related to PFAS.

42.     EID sought to limit its liability related to Long-Chain PFAS by engaging in a series of restructuring transactions, starting with the "spinoff" of its performance chemicals business (which included Long-Chain PFAS related operations) into Chemours, and continuing through the merger with The Dow Chemical Company, creating DowDuPont Inc., the transfer of EID's historic assets away from EID, the transfer of such assets to other DowDuPont Inc. entities, and, ultimately, the spin-off of EID to a new parent company named Corteva, Inc. On information and belief, EID was reorganized – and its assets were reshuffled – in order to shield tens of billions of dollars in assets from the PFAS liabilities EID tried to quarantine in Chemours.

43.     On July 1, 2015, EID completed the spinoff of its performance chemicals business (the "Spinoff") through the creation of Chemours, which became a separate, publicly-traded entity.

44.     To effectuate the Spinoff, EID and Chemours entered into a Separation Agreement (the "Separation Agreement").

45.     Upon information and belief, EID completed a significant internal reorganization prior to the Spinoff, so that all the assets and liabilities (held by EID and/or its subsidiaries) that EID deemed to be part of the performance chemicals business would be held by Chemours – including those related to the Long-Chain PFAS.

46.     In addition to the assets transferred to Chemours, EID caused Chemours to assume EID's historical liabilities arising from EID's discharge of PFOA into the environment. While

specific details about the liabilities are set forth in non-public schedules that are not available to Plaintiff at this time, the Separation Agreement required Chemours to assume what the agreement defines as "Chemours Liabilities," which include EID's historic liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on or subsequent to the effective date of the Spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, misrepresentation by EID and/or Chemours; and (v) which entity is named in any action associated with any liability.

47.     The Separation Agreement defines Chemours Liabilities broadly, to include "any and all Liabilities relating . . .  primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities. . . .," which include EID's historic liabilities relating to and arising from its decades of emitting PFOA into the environment and selling Long-Chain PFAS.

48.     Chemours also agreed to indemnify EID in connection with those liabilities that it assumed. The indemnification has no cap or temporal limitation.

49.     Chemours also agreed to use its best efforts to be fully substituted for EID with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities . . . ."

50.     Upon information and belief, there was no meaningful, arms-length negotiation of the Separation Agreement. Indeed, when the Separation Agreement was signed, Chemours was a wholly-owned subsidiary of EID, and a majority of the Chemours board consisted of EID employees.

51.     In connection with the Spinoff, Chemours paid EID approximately $3.9 billion, consisting of approximately $3.4 billion in cash, plus approximately $507 million in promissory notes.  Chemours also transferred all of its stock to EID, which was ultimately delivered to EID's shareholders.  In order to fund the $3.9 billion payment, Chemours issued unsecured senior notes and entered into a credit agreement with a syndicate of banks to provide two senior secured credit facilities, incurring a total of $4 billion in indebtedness.

52.     Chemours was thinly capitalized following the Spinoff.  Shortly after the Spinoff, market analysts described Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

53.     According to Chemours' unaudited pro forma financial statements, as of March 31, 2015 (but giving effect to all of the transactions contemplated in the Spinoff), Chemours had total assets of $6.4 billion and total liabilities of $6.3 billion.  Following the Spinoff, Chemours issued a 10-K stating that, as of December 31, 2015, Chemours had assets totaling $6.3 billion and total liabilities of $6.2 billion.

54.     The 10-K stated that these liabilities include $454 million in "other accrued liabilities," which included $11 million for accrued litigation and $68 million for environmental remediation.  The 10-K also stated Chemours had $553 million in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

55.     However, Chemours significantly understated its liabilities, especially the liabilities that it had assumed from EID related to Long-Chain PFAS, which EID and Chemours knew or should have known would amount to billions of dollars in addition to other environmental liabilities related to EID and Chemours facilities.  Had Chemours taken the full extent of these

-12-

liabilities into account, as it should have done, it would have negative equity (that is, liabilities that are greater than assets), and would be balance sheet insolvent.

## V.
## CAUSES OF ACTION

A.     **Strict Products Liability for Defective Design**

56.     Valero realleges and incorporates paragraphs 1 through 55 as if fully stated herein.

57.     Manufacturer Defendants' AFFF products containing or breaking down into Long-Chain PFAS, including PFOS and/or PFOA, were designed, manufactured, marketed and sold by Defendants.

58.     At the time Manufacturer Defendants' AFFF products in question were sold, Manufacturer Defendants were in the business of designing, manufacturing, marketing, selling, and/or incorporating into other products chemicals such as those in question here.

59.     At the time Manufacturer Defendants' AFFF products in question were designed, manufactured, marketed, and sold by them, they were defective in design and not reasonably safe as designed at the time they left Manufacturer Defendants' possession and control.  The defect in Manufacturer Defendants' AFFF products made Manufacturer Defendants' AFFF products unreasonably dangerous to Plaintiff and Plaintiff's property.

60.     At the time Manufacturer Defendants' AFFF products in question left their possession, there were economically and technologically feasible safer alternative designs that would have prevented or significantly reduced the risk of Plaintiff's damages without substantially impairing their products' utility.

61.     The defective and unreasonably dangerous condition of the Defendants' AFFF products has caused and will continue to cause injury to Plaintiff.  Defendants are strictly liable for all such damages.

62.     At the time the Manufacturer Defendants' AFFF products were used, they were in substantially the same condition as they were when placed into the stream of commerce. No material alterations were made to the products. The Manufacturer Defendants' AFFF products were in the same or substantially similar condition as when they left the control of Defendants.

63.     Valero is an entity who used, consumed, could have reasonably been affected by, and was affected by the Manufacturer Defendants' AFFF products. Valero has suffered and will continue to incur costs relating to disposal and replacement of unused products and detecting, investigating, monitoring, and addressing impacts from the use of Manufacturer Defendants' AFFF products, including PFOS and/or PFOA. Likewise, Valero has suffered and will continue to suffer property damages in terms of costs of abatement and/or loss of market value due to Manufacturer Defendants' AFFF products' contamination on, under and from the Sites. Manufacturer Defendants' AFFF products have caused damage to property other than Manufacturer Defendants' AFFF products. That damage was directly caused by the defect in Manufacturer Defendants' AFFF products. Manufacturer Defendants' AFFF products are the cause of Plaintiff's injury. Defendants are strictly liable for all such damages.

## B.     Strict Products Liability for Failure to Warn

64.     Plaintiff realleges and incorporates paragraphs 1 through 63 as if fully stated herein.

65.     Manufacturer Defendants' AFFF products containing or breaking down into Long-Chain PFAS, including PFOS and/or PFOA, were not reasonably safe at the time they left their control because those products lacked adequate warnings.

66.     At the time Manufacturer Defendants manufactured, marketed, and sold their products containing or breaking down into Long-Chain PFAS, including PFOS and/or PFOA, they knew their products were not safe because Long-Chain PFAS would need to be detected, investigated, monitored, addressed, and/or removed from the soil and groundwater, if the products

-14-

were used as intended.  Valero has been so injured.  Manufacturer Defendants' AFFF products involved a risk of harm to persons and property when they are used by an ordinary user in the way that they were intended to be sued and in a way that the Manufacturer Defendants could have reasonably foreseen they would be used.

67.     Despite Manufacturer Defendants' knowledge of attendant risks, they failed to provide adequate warnings and instructions that their products, if used as intended, would cause such damages.  Manufacturer Defendants also failed to provide adequate warnings and instructions concerning the precautions that must be taken when using their products in order to eliminate or limit the release of Long-Chain PFAS contamination when used as intended.   Manufacturer Defendants' AFFF products did not have adequate warning of their dangerous characteristics or adequate instructions for their safe use that are sufficient to inform an ordinary use of the risk of harm.

68.     Moreover, Manufacturer Defendants continued to conceal the dangers of their products after they manufactured, marketed, and sold such products.

69.     Without adequate warnings or instructions, Manufacturer Defendants' AFFF products were unsafe to an extent beyond that which would be contemplated by an ordinary person. The risk of harm is not one that an ordinary user would reasonably expected.  The particular danger would not have been apparent to an ordinary user from the nature of the products themselves or from other information known to the user.

70.     Manufacturer Defendants' conduct and Long-Chain PFAS, including PFOS and/or PFOA, released by their products at the Sites caused and continues to cause injury to Valero.

71.     Valero has suffered and will continue to incur costs relating to disposal and replacement of unused products and detecting, investigating, monitoring, and addressing impacts

from the use of Manufacturer Defendants' AFFF products, including PFOS and/or PFOA. Likewise, Valero has suffered and will continue to suffer property damages in terms of costs of abatement and/or loss of market value due to Manufacturer Defendants' AFFF products' contamination on, under and from the Sites. Defendants are strictly liable for all such damages.

## C.   Negligence

72.     Plaintiff realleges and incorporates paragraphs 1-71 as if fully stated herein.

73.     Manufacturer Defendants committed acts of omission and commission, which collectively constituted negligence, which were a direct, proximate, and but-for cause of the damages and injuries to Plaintiff.

74.     Manufacturer Defendants failed to exercise ordinary care because a reasonably careful company that learned of risks of the nature and kind alleged here would not manufacture or market that product, would warn of its risks and properties (even after it left its control), or would take steps to enhance the safety and/or reduce the impacts and risk of damage from its product.

75.     Manufacturer Defendants owed Valero a duty of care in the manufacture, marketing, and sale of Manufacturer Defendants' AFFF products containing Long-Chain PFAS, including PFOS and/or PFOA, because it was foreseeable to them that their products, when used as intended, would cause damage to property and consumers such as Valero.

76.     Manufacturer Defendants' negligent conduct in creating, exacerbating, and concealing the presence and risks of Long-Chain PFAS, including PFOS and/or PFOA, released from their products, caused and continues to cause damages to Valero.

77.     Valero has incurred and will continue to incur costs associated with Manufacturer Defendants' AFFF products. Defendants are liable to Valero for all such damages.

78.     Likewise, Valero have suffered and will continue to suffer property damages in terms of costs of abatement and/or loss of market value due to Manufacturer Defendants' AFFF products' contamination on, under, and from the Sites.

**D.     Gross Negligence**

79.     Plaintiff realleges and incorporates paragraphs 1-78 as if fully stated herein.

80.     Manufacturer Defendants committed gross negligence, which was a direct, proximate, and but-for cause of the damages and injuries to Plaintiff and for which Plaintiff is entitled to recover punitive damages.

81.     Manufacturer Defendants' acts and omissions involved an extreme degree of risk and recklessness, considering the probability and magnitude of potential harm to others.

82.     Even though Manufacturer Defendants were aware of these dangers, they acted recklessly and with conscious disregard to the rights, safety and welfare of Plaintiff and others by, among other things, refusing to incorporate safer alternative designs and provide warnings and misleading the Plaintiff and the consuming public about their products.

**E.     Actual Fraud, Constructive Fraud, and Deceit**

83.     Plaintiff realleges and incorporates paragraphs 1-82 as if fully stated herein.

84.     In the course of manufacturing, marketing, and selling their products, Manufacturer Defendants studied and had knowledge of the impacts of Long-Chain PFAS, including PFOS and/or PFOA, that they knew was unavailable to the Plaintiff and the rest of the general public. Defendants deliberately concealed information regarding the contamination effect of their products that might impair their lucrative business. The concealed information were material facts. Defendants had a duty to speak.

85.     The Long-Chain PFAS chemicals in Manufacturer Defendants' AFFF products have unique bioaccumulative properties and characteristics. Manufacturer Defendants were

acutely aware of these properties, which were known only to them.  Manufacturer Defendants knew their AFFF products would produce damages to the product users, yet continued to actively market the sale of their products.

86.     Indeed, Manufacturer Defendants knew their products were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the information only available to and deliberately withheld by them.

87.     While omitting information that may deter a sale, Manufacturer Defendants also made materially false statements designed to further the sales of their products to consumers, including Valero.   Manufacturer Defendants' statements were material representations and Manufacturer Defendants knew those statements were false or made them with recklessly without knowledge of the truth.  For example, with knowledge to the contrary, 3M issued a statement in 2000 that its products were safe. Manufacturer Defendants also directly – and through a trade group established to dispel concerns the USEPA had raised about their products – published false information about Manufacturer Defendants' AFFF products not containing or breaking down into Long-Chain PFAS, including PFOA.  Valero relied on such statements to their detriment in purchasing and using Manufacturer Defendants' AFFF products.  Manufacturer Defendants' false statements were made with the intention that Valero and others would reply upon them. Manufacturer Defendants, through the breach of a duty owed to Plaintiff, have gained an advantage by misleading Valero to its prejudice.

88.     Valero has incurred costs associated with addressing Manufacturer Defendants' AFFF products because it acted in justifiable reliance upon false and misleading statements made by them in the promotion and sale of their products.  Valero's reliance was justifiable.

**F.     Unjust Enrichment**

89.     Plaintiff realleges and incorporates paragraphs 1-88 as if fully stated herein.

90.     Valero has incurred and will continue to incur expenses in connection with the use and presence of Manufacturer Defendants' AFFF products at the Sites, including disposal and replacement costs of unused products, and identification, investigation, monitoring, remediation, assessment, and other costs incurred as a result of the Defendants' fraud and other acts and/or omissions described herein.

91.     Defendants are responsible for expenditures related to Manufacturer Defendants' AFFF products and Long-Chain PFAS, including PFOS and/or PFOA, which were caused by the use of their products.  In accordance with equitable principles, Defendants should have to pay these costs.  It would be unjust for Defendants to retain the benefit of Valero's expenditures incurred in connection with their products.  For Defendants to fail to make restitution to Valero would be inequitable.  Defendants have been unjustly enriched at Valero's expense.

92.     Accordingly, Valero requests restitution for the full amount by which Manufacturer Defendants were unjustly enriched and an injunction ordering Manufacturer Defendants to return all monies by which they were unjustly enriched as a result of Valero' expenditures in connection with Manufacturer Defendants' AFFF products.

**G.     Common Law and UCC Breach of Implied Warranties**

93.     Plaintiff realleges and incorporates paragraphs 1-92 as if fully stated herein.

94.     Manufacturer Defendants are merchants with respect to AFFF products.

95.     Manufacturer Defendants' AFFF products are not fit for the ordinary purposes for which such goods are used and are not adequately labeled.

96.     Manufacturer Defendants' AFFF products are not merchantable.

97.   At the time of contracting, Manufacturer Defendants knew the particular purpose for which their AFFF products were required.  Manufacturer Defendants' AFFF products were not fit for such purpose.

98.   Valero relied on Manufacturer Defendants' skill and judgment to furnish suitable goods.

99.   Manufacturer Defendants, in selling their products, breached implied warranties of merchantability and fitness, which were a producing and proximate cause of Plaintiff's damages.

## H.   Actual Fraudulent Transfer (EID and Chemours)

100.   Plaintiff realleges and incorporates paragraphs 1-99 as if fully stated herein.

101.   Through their effectuation of the Spinoff, Chemours and EID (the "Fraudulent Transfer Defendants") caused Chemours to transfer valuable assets to EID, including the $3.9 billion dividend (the "Transfers"), while simultaneously assuming significant liabilities (the "Assumed Liabilities").

102.   The Transfers and Assumed Liabilities were made for the benefit of EID.

103.   At the time that the Transfers were made and the Liabilities were assumed, and until the Spinoff was complete, EID was in a position to, and in fact did, control and dominate Chemours.

104.   The Fraudulent Transfer Defendants made the Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay and defraud the creditors or future creditors of Chemours.

105.   Valero has been harmed as a result of the conduct of the Fraudulent Transfer Defendants.

106.     Under Oklahoma's Fraudulent Transfer Act, 24 O.S. §§ 112, et seq., and Delaware Code Tit. 6 Sec. 1301-1312, Valero is entitled to avoid the Transfers and to recover property or value transferred to and held by EID, to injunctive relief against further disposition of the transferred assets, and all other relief to which it has rights at law or in equity.

## I.     Constructive Fraudulent Transfer (EID and Chemours)

107.     Plaintiff realleges and incorporates paragraphs 1-106 as if fully stated herein.

108.     Chemours did not receive reasonably equivalent value from EID in exchange for the Transfers and Assumed Liabilities.

109.     Each of the Transfers and Chemours' assumption of the Assumed Liabilities was made to or for the benefit of EID.

110.     At the time that the Transfers were made and the Assumed Liabilities were assumed, and until the Spinoff was complete, EID was in a position to, and in fact did, control and dominate Chemours.

111.     The Fraudulent Transfer Defendants made the Transfers and assumed the Assumed Liabilities when Chemours was engaged or about to be engaged in a business for which its remaining assets were unreasonably small in relation to its business.

112.     Chemours was insolvent at the time or became insolvent as a result of the Transfers and its assumption of the Assumed Liabilities.

113.     At the time that the Transfers were made and Chemours assumed the Assumed Liabilities, the Fraudulent Transfer Defendants intended to incur, or believed or reasonably should have believed that Chemours would incur, debts beyond its ability to pay as they became due.

114.     Valero has been harmed as a result of the Transfers.  Under Oklahoma's Fraudulent Transfer Act, 24 O.S. §§112, et seq., and Delaware Code Tit. 6 Sec. 1301 to 1312, Valero is entitled

to avoid the Transfers and to recover property or value transferred to or held by EID, to injunctive relief against further disposition of the transferred assets, and all other relief to which it has rights at law or in equity.

**J.   Violation of the Oklahoma Consumer Protection Act**

115.   Plaintiff realleges and incorporates paragraphs 1-114 as if fully stated herein.

116.   Plaintiff is a consumer of Manufacturer Defendants' products.

117.   Manufacturer Defendants engaged in unlawful practices.   Specifically, Manufacturer Defendants made false representations, knowingly or with reason to know, as to the characteristics, uses, and benefits, of their products, which were the subject of a consumer transaction, and committed unfair and deceptive trade practices, as defined by 12 O.S. § 752, through misrepresentations, omissions, and other practices that have deceived and could reasonably be expected to have deceived or mislead a person to the detriment of that person and though practices which offend established public policy and which are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

118.   Manufacturer Defendants' unlawful practices occurred in the course of Manufacturer Defendants' business

119.   Manufacturer Defendants' unlawful practices caused an injury in fact to Plaintiff, as a consumer.

120.   Manufacturer Defendants' commission of acts and practices in violation of the Oklahoma Consumer Protection Act are unconscionable.

121.   As a result of Manufacturer Defendants' unlawful practices, Plaintiff has sustained actual damages and has incurred costs of litigation.

## VI.
## COMPLIANCE WITH GOVERNMENT STANDARDS

122.   No mandatory safety standard or regulation adopted and promulgated by the federal government or an agency of the federal government was applicable to the Manufacturer Defendants' AFFF products at the time they were manufactured that governed any product risk that caused Plaintiff's damages.

## VII.
## DAMAGES

123.   **Actual Damages.** Plaintiff seeks all damages allowed at law.  As a direct and proximate result of the foregoing events, Plaintiff suffered damages in the past, and will in reasonable probability have damages in the future, all for which suit is now brought.

124.   **Exemplary Damages.** As a result of Defendants fraud, gross negligence, reckless conduct, wanton conduct, malicious conduct, and intentional conduct, Plaintiff seeks exemplary damages against Defendants in an amount deemed appropriate by the jury.

125.   **Prejudgment and post-judgment interest.** Plaintiff seeks pre-judgment and post-judgment interest at the highest rate allowed by law.

## VIII.
## REQUEST FOR JURY TRIAL

126.   Plaintiff hereby requests a trial by jury.

## IX.
## CONDITIONS PRECEDENT

127.   All conditions precedent to Plaintiff's rights to recover herein and to Defendants' liability have been performed, have occurred, or have been waived by Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Valero requests judgment in its favor and against Defendants as follows:

a.      Holding and declaring all Defendants to be strictly liable, and jointly and/or severally liable as appropriate, to Valero for the claims set forth above, and awarding Valero damages consisting of costs incurred and to be incurred in responding to any contamination caused by the Manufacturer Defendants' AFFF products, and damages for injury to, destruction of, and loss of Valero's property, including the costs of disposing of and replacing unused products, and assessing, monitoring and/or remediating damages, and the costs of experts needed to make such an assessment;

b.      Ordering injunctive relief and requiring Defendants to perform investigative and remedial work in response to any threats and/or damages they have caused;

c.      Awarding damages to pay for the remediation and/or restoration of the Long-Chain PFAS chemicals and/or for efforts, and/or to pay for the diminution in market value for each of the Sites;

d.      As to the Fraudulent Transfer Defendants, ordering the Transfers void, allowing Plaintiff to recover property or value transferred to or held by EID, allowing injunctive relief against further disposition of the transferred assets, and providing all other relief to which Plaintiff have rights at law or in equity;

e.      Awarding exemplary damages in an amount to be determined at trial;

f.      Awarding Valero's reasonable attorneys' fees and costs;

g.      Award Valero a civil penalty in the amount of $2,000 for each unconscionable act or practice of Manufacturer Defendants in violation of the Oklahoma Consumer Protection Act;

h.     Require Manufacturer Defendants to forfeit and pay a civil penalty of $10,000 per violation of the Oklahoma Consumer Protection Act;

i.     Awarding equitable relief for Valero's reasonably expected future damages as set forth above; and

j.     Awarding such other and further relief at law and/or in equity that the Court deems appropriate.

Respectfully submitted:

By: _____

D. Kenyon Williams, Jr., OBA #9643
Dawson A. Brotemarkle, OBA #31495
HALL, ESTILL, HARDWICK, GABLE,
    GOLDEN & NELSON, P.C.
320 S. Boston Ave., Suite 200
Tulsa, OK  74103-3706
Telephone (918) 594-0400
Facsimile (918) 594-0505
kwilliams@hallestill.com
dbrotemarkle@hallestill.com

**ATTORNEYS FOR PLAINTIFF
VALERO REFINING COMPANY-
OKLAHOMA**

4082757.1:830038:00700

-25-